**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

UNITED STATES OF AMERICA,

        Plaintiffs,

vs.

RAUL VILLASENOR GUTIERREZ and
JESSY QUINTERO,

        Defendants.

**REPORT AND RECOMMENDATION**

2:07-cr-091 PGC

Judge Paul G. Cassell

Magistrate Judge Brooke C. Wells

Before the court are motions to suppress evidence and statements filed by Defendants Raul Villasenor-Gutierrez and Jessy Quintero.  Defendants allege violations of their Fourth and Fifth Amendment rights.[1]  After reviewing all the evidence before the court, and as outlined in greater detail below, the court finds that Mr. Quintero lacks standing to challenge the search of the vehicle at the gas station.  The court further finds that officers had probable cause to search the vehicle at the gas station.  Therefore, Mr. Villasenor's motion to suppress should be DENIED.  Next, the court finds that Mr. Quintero invoked his *Miranda* rights and that the police violated these rights by initiating further questioning.  Further, the court finds that Mr. Villasenor voluntarily waived his *Miranda* rights.  Thus, Mr. Quintero's motion to suppress should be GRANTED in PART.

---

[1] Docket nos. 28 and 30.

Accordingly, the court recommends that Mr. Villasenor's motion to suppress be DENIED and that Mr. Quintero's motion to suppress be GRANTED in PART and DENIED in PART.[2]

## FINDINGS OF FACT[3]

## I. General Overview of the Case

This case presents an interesting and somewhat complex series of events.  Due to this complexity and the number of participants involved the court notes the following: There are two sets of searches.  Those that occurred roadside and the more invasive search of the truck in question that took place at a gas station in the sleepy little town of Fillmore, Utah.  Two Defendants are involved, Mr. Villasenor the driver of the truck and Mr. Quintero, the passenger. Two Utah highway patrol troopers are involved -- Trooper Mortensen, who stopped the vehicle, conducted the roadside searches, interrogated the Defendants, and transported them to jail; and Trooper Shields, involved with the roadside inventory search and the search of the vehicle at the gas station.  Detective Ekker, a member of the Central Utah Narcotics Task Force, interrogated the Defendants multiple times and also assisted in the search at the gas station.  Finally, there are four primary instances where Defendants are interrogated: First, those that occurred roadside after the stop where marijuana was found; Second, Defendants were questioned after they arrived

---

[2] The court took Defendants' motions under advisement on September 4, 2007, following the receipt of all transcripts from the hearings held in this matter.

[3] Evidence is taken from the evidentiary hearings held on Defendants' motions to suppress.  The hearings occurred over two days June 5, 2007 and June 6, 2007.  Relevant portions of the transcript of the June 5th hearing are referenced as "Tr."  Relevant portions from the transcript of the June 6th hearing are referenced as "Tr2"  The court also heard final arguments on Defendants' motions on August 9, 2007.  Portions from this transcript are referenced as "Tr3."

at the local jail before methamphetamine was discovered in the vehicle; Third, after the discovery of the methamphetamine; And finally, Mr. Villasenor was interrogated following the failed controlled buy that was set up to deliver the methamphetamine.  Other individuals are also involved in this case, but the foregoing individuals are those that the court considers to be the major participants.

## II. The Stop of the Vehicle

Trooper Gorden Mortensen, an employee of the Utah Highway Patrol for 15 years, initiated a traffic stop on a black extended cab Chevy Silverado pick-up at approximately 10:25 a.m. on January 10, 2006.  As the Silverado passed, Trooper Mortensen noticed that the tinting on the front windows prevented him from seeing the occupants.[4]  He decided to stop the vehicle. Neither Defendant challenges the validity of the initial stop.[5]

While approaching from the passenger side, Trooper Mortensen noticed the bed of the truck was empty and there were no personal belongings.[6]  When the window was lowered the Trooper observed two male occupants.  Mr. Quintero was located in the passenger seat and Mr. Villasenor in the driver seat.  Trooper Mortensen also smelled "a strong odor of marijuana, burnt

---

[4] Tr. at 16.
[5] Utah law provides that a person may not operate a vehicle with "a front side window that allows less than 43% light transmittance."  Utah Code Ann. § 41-6a-1635(1)(b) (2005).  Trooper Mortensen's subsequent test of the windows showed that they only allowed seven percent light transmittance.  *See* Tr. at 31.
[6] Tr. at 16-17.

marijuana, coming from the vehicle."[7]   Trooper Mortensen has extensive training in narcotics

interdiction and has smelled both raw and burnt marijuana many times.[8]

   The Trooper asked Mr. Villasenor for his license and registration and Mr. Villasenor

responded that he had forgotten them in California.[9]   Trooper Mortensen explained that the

vehicle would have to be impounded because of the lack of a license or proof of ownership.

Usually, a vehicle is impounded "if there's not a licensed driver or . . . any proof of

ownership."[10]   And, when a vehicle is impounded it is subject to an inventory search pursuant to

Utah Highway Patrol policies and procedures.[11]

   While speaking with the occupants, the Trooper noticed that the passenger, Mr. Quintero,

had glassy, red eyes with dilated pupils, and acted lethargic.[12]   Such symptoms are consistent

with marijuana use.   When asked, however, both occupants denied smoking any marijuana.[13]

Despite their denials, the Trooper decided to search the vehicle based upon what he had observed

thus far.   Both occupants exited the vehicle when asked and agreed to the search.[14]   The Trooper

patted each occupant down, found nothing, and then directed them to stand in the front of the

---

[7] *Id.* at 21.
[8] *Id.*
[9] *Id.* at 19.
[10] *Id.* at 19-20.
[11] *Id.* at 20.
[12] *Id.* at 21-22.
[13] *Id.* at 22.
[14] *Id.* at 23.

vehicle while he searched.[15]   Although the Trooper found nothing indicating drug use on either occupant, the Trooper testified that at this point they were not free to leave.[16]

### III. Roadside Search of the Vehicle

In the console between the driver and passenger seats Trooper Mortensen found what appeared to be approximately two grams of  marijuana "that had been spilled in the compartment."[17]  The Trooper thought it was somewhat unusual to find that much loose marijuana, but in his opinion, the amount was still consistent with "personal use."[18]  After discovering this substance, the Trooper determined to conduct a more thorough search of the vehicle believing that there may be more hidden illegal contraband.[19]  The Trooper also planned on arresting the occupants.

Trooper Mortensen continued his search and found a large empty Swisher Sweet cigar box behind the driver's seat on the floor.[20]  This was the largest Swisher Sweet box the Trooper had ever seen as it could hold 500 cigars.  Usually, the boxes of Swisher Sweets found by Trooper Mortensen would hold "six or eight of the small cigars"[21] not hundreds of cigars. Swisher Sweets are popular for making marijuana blunts by pushing the tobacco out and

---

[15] *Id.* at 23, 51.
[16] *Id.*
[17] *Id.* at 23.
[18] *Id.* at 49.
[19] *Id.* at 24.  It is unclear from the record whether at this point Trooper Mortensen intended to search the vehicle further while it remained on the side of the road or whether he intended to have it towed to the gas station and then searched.
[20] *Id.* at 25.
[21] *Id.*

replacing it with marijuana.  In the ash tray the Trooper discovered one partially smoked blunt and another blunt that was broken in half which appeared to have been tampered with.[22]

The Trooper also noticed that there was no luggage in the truck, no personal hygiene items or shaving kits, and no extra clothes.[23]  Trooper Mortensen testified that he thought this was odd because the men were approximately 600 miles from their home in California without much of anything other than the clothes they were wearing.[24]  Based on what had been found and what the Trooper observed, the Trooper thought the occupants may be involved in some type of criminal activity such as transporting drugs.[25]  So, he decided to question the men.

## IV. Roadside Interviews

Trooper Mortensen separated the occupants and spoke with the driver, Mr. Villasenor first.[26]  Trooper Mortensen recited to Mr. Villasenor his *Miranda* warnings from memory, asked if he understood them and if he was willing to waive them.  According to the Trooper, Mr. Villasenor said he understood his rights, waived them and agreed to answer questions.[27]  In contrast, Mr. Villasenor testified that while he was advised of his rights, the Trooper did not ask him if he waived them but instead, just started to immediately ask questions.[28]  The court finds-after having observed and heard both witnesses-that Trooper Mortensen is a credible witness and

---

[22] *Id.* at 26.
[23] *Id.* at 26-27.
[24] *Id.* at 27.
[25] *Id.*
[26] *Id.* at 28.
[27] *Id.*
[28] Tr2 at 49-50.

accepts his testimony that Mr. Villasenor waived his rights and agreed to answer questions.[29]

Therefore, the court finds that Mr. Villasenor voluntarily waived his *Miranda* rights.  As outlined

in greater detail below, this finding is further supported by the fact that the passenger, Mr.

Quintero, chose to invoke his rights and not answer questions.

 Mr. Villasenor told the Trooper that he was traveling to Salt Lake City from Los Angeles

to visit his aunt for a couple of hours and then drive back to California.[30]  The Trooper found Mr.

Villasenor's story illogical and "had really strong convictions that there was something going on

other than a trip to see his aunt."[31]  Trooper Mortensen asked Mr. Villasenor the last time he had

smoked marijuana.[32]  Defendant replied that he had smoked some last night.  Based on this

information, the Trooper told Mr. Villasenor that in addition to the marijuana possession charge,

"he would be charged with driving with a measurable amount of a controlled substance or its

metabolite in his body."[33]  Mr. Villasenor was handcuffed and placed on the edge of the road

between the vehicle and the patrol car.

 After placing Mr. Villasenor under arrest Trooper Mortensen spoke with Mr. Quintero.

The Trooper advised him of his *Miranda* rights and Mr. Quintero stated that he understood his

---

[29] *See United States v. Taverna*, 348 F.3d 873, 877 (10th Cir. 2003) ("At a hearing on a motion to suppress, the . . .
judge assesses the credibility of witnesses and determines the weight to be given to the evidence.").
[30] Tr. at 28-29.
[31] *Id.* at 30.
[32] *Id.*
[33] *Id.*

rights, chose to invoke them and not answer questions.[34]  Mr. Quintero was placed into

handcuffs and was not questioned further at this time.

Around this same time another Trooper, Dan Shields, crossed the freeway to assist

Trooper Mortensen.[35]  Trooper Shields wrote down the inventory from the "inventory search" of

the truck that was conducted on the side of the freeway.[36]  Trooper Mortensen testified that this

inventory search met the police policy for inventorying a vehicle when it was impounded.[37]

After the roadside searches were conducted, Trooper Mortensen intended on searching

the "vehicle in greater detail, but rather than do it on the edge of the road"[38] where it was more

dangerous, a wrecker was called to take the vehicle to "a more controlled environment"[39] - a gas

station in Fillmore, Utah.  Trooper Shields went with the truck to the gas station.

### V. Interviews at the Jail Before the Discovery of Methamphetamine

While the vehicle was being towed to a nearby gas station Trooper Mortensen transported

the Defendants to jail.  Detective Ekker met Trooper Mortensen and the Defendants at the jail.

Mortensen told Ekker that he had smelled burnt marijuana, found some in the vehicle, and had

placed both Defendants under arrest.[40]  Detective Ekker then took Mr. Villasenor inside into the

booking area for further questioning.

---

[34] *Id.* at 31.
[35] *Id.*
[36] *Id.* at 44.
[37] *Id.* at 44.
[38] *Id* at 31.
[39] *Id.*
[40] Tr2 at 6.

After Mr. Villasenor was taken inside the jail Mr. Quintero remained in the car with Trooper Mortensen who was completing paperwork.[41]  While completing his paperwork Trooper Mortensen told Mr. Quintero that if he was willing to tell him where there was contraband in the vehicle, Mortensen would be willing to make a deal with him and see if the prosecutor could get the charges dropped or work out "some type of deal."[42]  Trooper Mortensen never asked Mr. Quintero if he had changed his mind about not wanting to talk.[43]  But, after being told about a possible deal, Mr. Quintero told the Trooper that the only contraband in the vehicle was a small amount of marijuana wrapped inside the page of a magazine which was located in the passenger side door.[44]  Trooper Mortensen had not discovered this marijuana during the roadside searches so he called Trooper Shields to tell Shields about it.  Mr. Quintero also told Trooper Mortensen that he and Mr. Villasenor were traveling to Salt Lake to visit Mr. Villasenor's aunt who was very sick and might die.

Eventually, Mr. Quintero was taken into the booking area and questioned by Detective Ekker.[45]  Ekker did not readvise Mr. Quintero of his *Miranda* rights, but he did ask Mr. Quintero if he had been mirandized previously and whether he understood those rights.[46]  Ekker was never told that Mr. Quintero had previously invoked his rights.  Mr. Quintero agreed to talk and Ekker asked Mr. Quintero the same type of background and travel itinerary questions that he had earlier

---

[41] *Id.*
[42] Tr. at 34, 52-53.
[43] *Id.* at 53.
[44] *Id.* at 34.
[45] Tr2 at 8.
[46] *Id.* at 8, 39-40.

asked Mr. Villasenor.  Mr. Quintero replied that they were traveling to visit Mr. Villasenor's

aunt who was sick [47]  Mr. Quintero also stated that there was marijuana in the vehicle but no

other drugs.  Following this interview, Detective Ekker went to assist in the search of the vehicle

at the gas station.[48]

### VI. Gas Station Search

Concurrent to the transportation of Defendants to the jail and during their initial

interviews Trooper Shields and Agent Rod Elmer (not to be confused with Detective Ekker)

began a more detailed search of the truck after it was towed to the gas station.[49]  They checked

the tires, scoped the gas tank, and removed the dashboard paneling and faceplate of the stereo.[50]

After the stereo was removed methamphetamine was located in a "void where the stereo mounts

in the dashboard."[51]

After being informed about the discovery of methamphetamine Trooper Mortensen

returned to the gas station and retrieved the marijuana in the side door pocket that Mr. Quintero

had told Mortensen about while sitting in Mortensen's car.[52]  This marijuana had not been found

despite Mortensen's earlier phone call telling Trooper Shields about it allegedly because the

officers were so busy "looking in the dashboard and stuff."[53]

---

[47] *Id.*
[48] *Id.* at 10, 18, 21.
[49] Tr. at 45
[50] *Id.* at 46, 55; Tr2 at 21-25.
[51] Tr. at 32, 45; Tr2 at 10, 22, 24.
[52] Tr. at 55.
[53] *Id.*

Detective Ekker also assisted in the search at the gas station and was involved in finding the methamphetamine located behind the stereo in the dash.  Detective Ekker returned to the jail to confront the Defendants and ask them about the methamphetamine.[54]

### VII. Interviews of the Defendants Following the Discovery of Methamphetamine

After returning to the jail, Ekker went to speak with Mr. Villasenor first.  Ekker told Mr. Villasenor what was found and asked if he wanted to be honest now.[55]  Ekker also asked Mr. Villasenor if he would be "interested in helping himself out by working with us."[56]  Mr. Villasenor agreed.  At some point Mr. Villasenor was promised that any potential charges would be prosecuted at the state level, rather than at the federal level.[57]  Mr. Villasenor told Ekker he was partners with Mr. Quintero and that they were going to deliver the drugs to Salt Lake City.  Further, it would be necessary for Mr. Quintero to go with him on any attempted controlled delivery.  Detective Ekker did not readvise Mr. Villasenor of any *Miranda* rights before having this discussion.[58]

After talking with Mr. Villasenor, Ekker spoke with Mr. Quintero about what was found in the vehicle.[59]  Mr. Quintero was not readvised of his rights and at some point during this interview Mr. Quintero acknowledged the presence of the drugs and that he expected to be paid

---

[54] Tr2 at 10.
[55] *Id.* at 10-11.
[56] *Id.* at 11.
[57] *Id.* at 26.
[58] *Id.* at 10 -12.
[59] *Id.* at 11, 44.

$500 for helping with the delivery.[60]  Mr. Villasenor was present for part of this interview with

Mr. Quintero in order to try and convince him to cooperate with the controlled delivery.[61]  Other

officers also came and went during the interview.  But, when the details were worked out about

what the Defendants would get for their cooperation, the county attorney and Commander

Pearson were present.[62]  The county attorney offered Defendants a deal and Mr. Quintero agreed

to assist with the controlled delivery.

### VIII. The Controlled Delivery and Final Jail Interview of Mr. Villasenor

While in route to Salt Lake City for the controlled delivery, it became clear that there was

no actual delivery location and the controlled delivery failed.[63]  The officers were upset at what

had occurred and at some point Officer Elmer shoved Mr. Quintero up against a car and pushed

his face into the window.[64]

After the failed delivery everyone returned to Fillmore and the next day Detective Ekker

again interviewed Mr. Villasenor in a taped conversation.[65]  Ekker was looking for incriminating

evidence against the Defendants and wanted additional information about their supposed drug

contact "Chino."[66]  Ekker did not readvise Mr. Villasenor of his *Miranda* rights but did ask

---

[60] *Id.* at 40-42, 44.
[61] *Id.* at 12-13.
[62] *Id.* at 12.
[63] *Id.* at 13-15.
[64] *Id.* at 29.
[65] *Id.* at 16; *see also* CD.
[66] *Id.* at 19-20.

whether he remembered them and whether he wanted to talk with him.[67]  Mr. Villasenor was

asked about Mr. Quintero's involvement.  He responded that Mr. Quintero knew about the drugs

and was hired by him to help with the delivery.  A number of times throughout the interview

Detective Ekker urged Mr. Villasenor to cooperate so he would not go down alone.

Approximately eight minutes into the interview Mr. Villasenor asked about getting an attorney

and shortly thereafter the interview was terminated.[68]

## ANALYSIS

The Fourth Amendment protects individuals from unreasonable searches and seizures.[69]

A routine traffic stop is considered a seizure under the Fourth Amendment.[70]  The Tenth Circuit

has held that "a routine traffic stop is more analogous to an investigative detention than a

custodial arrest."[71]  Therefore, such cases are analyzed "under the principles developed for

investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889

(1068)."[72]  To determine the reasonableness of an investigative detention a dual inquiry is made,

asking first "whether the officer's action was justified at its inception, and [second] whether it

was reasonably related in scope to the circumstances which justified the interference in the first

place."[73]

---

[67] CD interview.
[68] *Id.*
[69] *See* U.S. Const. amend IV; *U.S. v. Holt*, 229 F.3d 931, 934 (10th Cir. 2000).
[70] *See* *U.S. v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (en banc).
[71] *U.S. v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005).
[72] *U.S. v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998).
[73] *Terry*, 392 U.S. at 20.

Here, neither Defendant contests the initial stop.  The roadside searches are also not at issue.  Trooper Mortensen smelled burnt marijuana when talking with the occupants, and the Tenth Circuit has concluded that if an officer smells burnt marijuana coming from the passenger compartment of a vehicle then there is "probable cause to search the passenger compartment."[74] Moreover, both Defendants consented to the initial roadside search.  But, both Defendants argue that the search of the vehicle at the gas station exceeded any permissible scope and was not supported by probable cause.  In essence according to Defendants, although some marijuana was discovered in the passenger compartment of the vehicle, the circumstances surrounding the stop do not justify the later search where officers removed the truck's dashboard panels and discovered methamphetamine.

### I.  Validity of the Search of the Vehicle at the Gas Station

Before the court considers the validity of the search at the gas station it must first consider whether Mr. Quintero, as a passenger in the truck, has standing to contest that search of the vehicle.[75]  The government argues that Mr. Quintero does not assert a possessory or ownership right in the vehicle and therefore lacks standing to contest the search.  Conversely, Mr. Quintero argues that because he has standing to contest the lawfulness of his own arrest and continued detention, then he also has standing to object to the search of the vehicle.

---

[74] _U.S. v. Parker_, 72 F.3d 1444, 1450 (10th Cir. 1995).

[75] "Standing is really a shorthand method of referring to the issue of whether the defendant's own Fourth Amendment interests were implicated by the challenged governmental action."  _U.S. v. Eylicio-Montoya_ 70 F.3d 1158, 1162 fn. 1 (10th Cir. 1995) (quoting _U.S. v. Kimball_, 25 F.3d 1, 5n. 1 (1st Cir. 1994)).

**A.  Defendant Quintero's Standing to Contest the Search of the Vehicle and His Detention**

Fourth Amendment rights are personal[76] and in accordance with this principle the Tenth Circuit has held that a passenger in a vehicle, who does not have a possessory or ownership interest in the vehicle, lacks standing to challenge the search of the vehicle.[77]  The Tenth Circuit, however, has "repeatedly recognized that although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the [defendant's] illegal detention."[78]  To suppress evidence as the fruit of an unlawful detention, a defendant must make two showings: (1) "'that the detention did violate his Fourth Amendment rights'; and (2) that there is 'a factual nexus between the illegality and the challenged evidence.'"[79]

**(i) Mr. Quintero's Contention that the Initial Arrest and Continued Detention Violated his Fourth Amendment Rights**

Defendant Quintero does not contest the legality of the initial stop.  Instead, Mr. Quintero argues his arrest was not supported by probable cause and that his continued detention was

---

[76] *See U.S. v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989) (citations omitted).

[77] *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (holding that a passenger who fails to assert a possessory or property interest in a vehicle would normally not have a legitimate expectation of privacy in the vehicle protected by the Fourth Amendment); *see also U.S. v. Lewis*, 24 F.3d 79, 81 (10th Cir. 1994); *U.S. v. Jefferson*, 925 F.2d 1242, 1249 (10th Cir. 1991); *U.S. v. Erwin*, 875 F.2d 268 (10th Cir. 1989).

[78] *U.S. v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).

[79] *U.S. v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (quoting *U.S. v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)).

improper.[80]  In order to make a warrantless arrest probable cause must exist.  "Probable cause to arrest exists when an officer has learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested."[81]  In determining whether probable cause to arrest exists, the totality of the circumstances is considered and while there need not be facts sufficient to establish guilt, there must be more than a mere suspicion.[82]  Also pertinent to this case is the principle that probable cause to arrest does not arise solely from one's presence or propinquity to another accused of a crime.[83]

The following facts were before Trooper Mortensen when he arrested Mr. Quintero: (1) Mr. Quintero was riding in a vehicle from California that was stopped due to improper widow tinting; (2) there were no personal items or luggage in the truck although the men were approximately 600 miles from home; (3) the driver of the truck failed to provide proper license and registration material, at some point, however, the Trooper determined that the driver did own the vehicle; (4) the smell of burnt marijuana; (5) Mr. Quintero had glassy, red eyes with dilated pupils and acted lethargic which are symptoms of possible marijuana use; (6) a consensual search of the shared passenger compartment yielded: approximately two grams of marijuana that

---

[80]  An objection to detention is personal therefore Mr. Quintero does have standing to object to his initial arrest and his continued detention.  *See* U.S. v. Parias, 43 F.Supp.2d 1276, 1280 (D.Utah 1999).
[81]  U.S. v. Guerrero-Hernandez, 95 F.3d 983, 986 (10th Cir. 1996).
[82]  *See* U.S. v. Springfield, 196 F.3d 1180, 1183 (10th Cir. 1999).
[83]  *See id.* ("'nearness to the place of the arrest of a co-conspirator or to the place of illegal activity' is not sufficient to establish probable cause'") (citation omitted); U.S. v. Dozal, 173 F.3d 787, 792 (10th Cir. 1999) ("Association with persons suspected of criminal conduct or nearness to the site of illegal activity does no alone suffice.").

had been spilled in the compartment between the seats, the largest box of Swisher Sweet cigars

the Trooper had ever encountered, a used blunt in the ashtray and another blunt that was broken

in half which appeared to have been tampered with; (7) the codefendant, Mr. Villasenor admitted

to smoking marijuana the night before; and (8) an explanation that the Defendants were traveling

from Los Angeles to Salt Lake City in order to visit Mr. Villasenor's aunt for a couple of hours.

      While the facts before the Trooper do not establish guilt, for example there was no drug

paraphernalia specifically found on Mr. Quintero, the court finds that the circumstances prior to

the arrest do establish more than a suspicion.  The marijuana was found in the console between

the seats, a used blunt was found along with another that had been broken in half and a large

Swisher Sweet cigar box was found – one that could contain 500 cigars.  Further, both men were

a long distance from home without any personal supplies and Mr. Quintero exhibited symptoms

consistent with possible marijuana use.  Based on the facts before Trooper Mortensen the court

concludes that the Trooper could reasonably infer a connection between Defendant Quintero and

the drugs found in the shared passenger compartment.  This is not an instance where there is only

mere propinquity to another accused of a crime.  Accordingly, the court concludes that in

considering the totality of the circumstances there was probable cause to initially arrest

Defendant Quintero.

      Defendant Quintero also contests his continued detention.  Mr. Quintero argues his

continued detention was "premised on the purported methamphetamine located in the body of

the truck based upon an illegal search."[84]   As discussed *supra*, Defendant Quintero was arrested based on what Trooper Mortensen had discovered and learned during the initial stop.  There is no evidence before the court indicating that Mr. Quintero was held for an unreasonable period of time before the methamphetamine was discovered.  Moreover, after the methamphetamine was discovered there was increased probable cause to further detain and question Mr. Quintero.  This increased probable cause, however, does not eliminate the alleged *Miranda* violations that Mr. Quintero argues occurred in this case.  These arguments will be addressed *infra*.

Accordingly, the court concludes Mr. Quintero's Fourth Amendment rights were not violated by his arrest and continued detention.

**(ii) The Factual Nexus**

Next, Defendant Quintero argues that even if this court determines his arrest was proper, the court should still find Mr. Quintero has standing to object to the search because the alleged illegal search "taints his further detention and questioning."[85]   In essence, "the improper search of the vehicle was exploited to illegally continue the detention and coercive interrogation of Defendant Quintero.  He should therefore have standing to contest it since there is still the requisite 'factual nexus' between the illegal search and the illegal interrogation, albeit backwards from the usual case."[86]

---

[84] Mem. in supp. p. 17.
[85] *Id.* p. 18.
[86] *Id*. p. 18.

18

In support of his argument Defendant Quintero cites to *U.S. v. Hill*.[87]  In *Hill*, the Tenth

Circuit allowed the defendant to challenge the admissibility of evidence found on a houseboat

without requiring him to demonstrate a privacy interest in the boat.  The *Hill* court determined

that allowing the defendant's challenge was proper because the defendant argued all evidence

obtained as a result of his warrantless arrest was tainted and therefore must be suppressed.[88]

Thus, the court reasoned that "but for" the defendant's arrest the evidence would not have been

discovered.

Defendant Quintero also points to *U.S. v. DeLuca*[89] where the Tenth Circuit recognized

that a defendant may contest their own detention and the evidence found "'as the <u>fruit</u> of the

[defendant's] illegal detention.'"[90]

In contrast, the Government argues that Defendant Quintero cannot establish the required

factual nexus between the evidence and any alleged illegality.  According to the Government, to

establish this factual nexus, "the defendant bears the burden of showing that 'but for his, and

only his, unlawful detention,' the evidence would not have been discovered."[91]  In support of

this argument the Government cites to the same case as Defendant Quintero, *U.S. v. DeLuca*.[92]

---

[87] <u>855 F.2d 664</u> (10th Cir. 1988).
[88] *Id.* at 666.
[89] <u>269 F.3d 1128 (10th Cir. 2001)</u>.
[90] <u>*U.S. v. DeLucia*, 269 F.3d at 1132</u> (emphasis added) (alteration in original) (quoting *Nava-Ramirez*, 210 F.3d 1128)).
[91] Op. p. 8.
[92] <u>269 F.3d 1128 (10th Cir. 2001)</u>.

In *DeLuca*, the court relied on its earlier holding in *U.S. v. Nava-Ramirez*[93] in reaching its decision.  Therefore, the court looks to both cases for guidance.

In *Nava-Ramirez*, Mr. Nava-Ramirez was driving a car in which the owner of the vehicle, Steven Wald, was the passenger.  The vehicle was stopped and Mr. Nava-Ramirez provided a valid driver's license and Mr. Wald produced a valid vehicle registration.  The officer detained the men based primarily on the smell of "burnt methamphetamine emanating from the vehicle's interior" and observations that both occupants were nervous and that Mr. Wald's eyes were "bloodshot and glassy."[94]  After obtaining consent to search the passenger compartment, the officer patted down both occupants and found two pipes in Mr. Wald's pockets.  The passenger compartment search turned up nothing, but in the trunk of the vehicle, the officer found two packages of methamphetamine and both occupants were arrested.  The district court denied Mr. Nava-Ramirez's motion to suppress methamphetamine and he appealed.

On appeal, Mr. Nava-Ramirez argued that the methamphetamine should have been suppressed as the fruit of his own unlawful detention.  In rejecting Mr. Nava-Ramirez's arguments the court stated that "[a]t a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."[95]  Mr. Nava-Ramirez failed to provide such

---

[93] 210 F.3d 1128 (10th Cir. 2000).
[94] *Nava-Ramirez*, 210 F.3d at 1130.
[95] *Id.* at 1131.

evidence and the court went on to hold that Mr. Nava-Ramirez did not meet his "burden of proving a factual nexus between his detention and the evidence found in the trunk."[96]

In *DeLuca*,[97] Mr. DeLuca was a passenger riding in the front seat of a vehicle with two other individuals.  The vehicle was stopped at a driver's license and registration checkpoint.  The owner, who was in the backseat, provided registration and the driver provided a valid driver's license.  After detaining the occupants for some time the officer obtained the vehicle owner's consent to use a K-9 dog unit on the vehicle.  Two dogs independently alerted to the left side of the trunk and a green leafy substance along with a package was discovered.  The men were arrested and charged with possession of narcotics.  The district court granted Mr. DeLuca's motion to suppress finding the continued detention of the occupants illegal.  Therefore, the methamphetamine discovered in the package was suppressed because it was the fruit of Mr. DeLuca's illegal detention.[98]  The government appealed the district court's decision.

On appeal, the only issue before the Tenth Circuit was "whether the methamphetamine found in the car's trunk must be suppressed as the 'fruit' of Mr. DeLuca's illegal detention."[99] The court concluded that its decision was controlled by the holding in *Nava-Ramirez*, which required Mr. DeLuca to show that "the methamphetamine would never have been found but for *his*, and only his, unlawful detention."[100]  Mr. DeLuca failed to meet this burden.  Therefore, the

---

[96] *Id.* at 1132.
[97] 269 F.3d 1128.
[98] *See id.* at 1131.
[99] *Id.*
[100] *Id.* at 1133 (emphasis in original).

court reversed the district court and went on to hold there was no factual nexus between the methamphetamine and any illegal detention.

In accordance with the holdings of *Nava-Ramirez* and *DeLuca*, the court agrees with the Government that Defendant Quintero bears the burden of showing that "the methamphetamine would never have been found but for *his*, and only his, unlawful detention."[101]  The court finds U.S. *v. Hill,*[102] which is cited by Defendant in support of his argument, distinguishable from the current case because in *Hill* there was the required "but for" casual link between the evidence and the defendant's detention.  Here, the link is at best much more attenuated than in *Hill*, and as stated in *Nava-Ramirez*, "[a]t a minimum, [Mr. Quintero] must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."[103]  The court fails to find such evidence in the record.  Accordingly, the court finds that Mr. Quintero has failed to meet his burden of showing that but for his unlawful detention, the methamphetamine would not have been discovered.[104]

### (iii) Conclusion

As stated previously, to suppress evidence as the fruit of an unlawful detention, Defendant Quintero must make two showings: (1) "'that the detention did violate his Fourth

---

[101] *Id.* (emphasis in original).
[102] 855 F.2d 664 (10th Cir. 1988).
[103] *Nava-Ramirez*, 210 F.3d at 1131.
[104] *See* U.S. *v. Zavala*, 2006 WL 2604614, **3-4 (10th Cir.) (holding that the defendant, who was a passenger, failed to show a factual nexus between his alleged illegal detention and the discovery of marijuana in the van and therefore had no standing to challenge the officer's search of the van).

Amendment rights'; and (2) that there is 'a factual nexus between the illegality and the challenged evidence.'"[105]  "Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not 'fruit of the poisonous tree,' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."[106]  In this case there is no need for the Government to prove that the evidence was not fruit of the poisonous tree because Defendant Quintero failed to make either showing.

Therefore, the court concludes that Defendant Quintero lacks standing to challenge the search of the vehicle at the gas station.

## B.  The Search of the Vehicle at the Gas Station

Defendant Villasenor was both the operator and owner of the vehicle.  As such Mr. Villasenor has both a property and possessory interest in the vehicle and is entitled to challenge the search of the vehicle.

The question before the court is whether given the totality of the circumstances there was probable cause to search inside the dashboard of the truck after completion of the roadside searches.

---

[105] *U.S. v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (quoting *U.S. v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)).
[106] *Nava-Ramirez*, 210 F.3d at 1131.

An officer has probable cause to search a car "if, under the 'totality of the circumstances' there is a 'fair probability' that the car contains contraband or evidence."[107]  The Tenth Circuit has drawn distinctions regarding which parts of a vehicle may be searched.  If an officer smells marijuana in the passenger compartment of a vehicle, then she has probable cause to search the passenger compartment.[108]  The odor of marijuana in the passenger compartment does not, however, standing alone, establish probable cause to search the trunk of the vehicle.  Rather, an officer obtains sufficient probable cause to search the trunk of a vehicle if she "smells marijuana in the passenger compartment and finds corroborating evidence of contraband."[109]  Finally, "once probable cause to search is established, the officer may search the entire vehicle, including the trunk and all containers therein that might contain contraband."[110]

Mr. Villasenor concedes the validity of the roadside searches of the passenger compartment.  Defendant Villasenor, however, argues that the later search of the vehicle at the gas station, where officers removed the vehicle's dashboard console and discovered methamphetamine in a cavity behind the stereo, exceeded the scope of what was justified under

---

[107] *U.S. v. Nielsen*, 9 F.3d 1487, 1489-90 (10th Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 91983)).

[108] *See, e.g., U.S. v. Parker*, 72 F.3d 1444, 1450 (10th Cir. 1995) (holding that the "odor of marijuana in the passenger compartment of a vehicle does not, however, standing alone, establish probable cause to search the trunk of the vehicle"); *U.S. v. Nielsen*, 9 F.3d 1487, 1491 (10th Cir. 1993) (holding that the smell of burnt marijuana would lead a reasonable person to believe the passenger compartment might contain marijuana but not the trunk).

[109] *U.S. v. Bradford*, 423 F.3d 1149, 1160 (10th Cir. 2005); *see also*, *U.S. v. Loucks*, 806 F.2d 208, 210-22 (10th Cir. 1986) (finding an officer had probable cause to search the trunk of the defendant's car after he smelled and found marijuana in the passenger compartment); *U.S. v. Parker*, 72 F.3d 1444, 1450 (10th Cir. 1995) (concluding that the officer had probable cause to search the trunk of the defendants' car after he smelled burnt marijuana in the car and found corroborating evidence of contraband).

[110] *Id.*

the Fourth Amendment.[111]   In essence, according to Defendant Villasenor, the circumstances

surrounding the stop and the items discovered in the passenger compartment do not provide

probable cause to "completely dismantle"[112] the vehicle.

Next, Defendant argues the items found during the roadside search are consistent with

personal use and therefore do not support an expanded search.  Thus, "the officers involved in

the search abandoned any notion of probable cause supported by the facts of the case in favor of

a wholesale all or nothing approach."[113]   Finally, Defendant alleges if the court condones the

actions of officers in this case then "taken to its logical end, any officer who merely thought that

they detected the odor of burnt marijuana and then located so much as an iota of corroborating

evidence, say a single marijuana seed, would be perfectly justified in completely dismantling and

ripping apart a suspect's automobile."[114]

In contrast, the Government argues that Trooper Shields and Agent Elmer had probable

cause to search the remainder of the vehicle.  During the initial search Trooper Mortensen

discovered loose marijuana and some blunts.  The Government contends even if the discovery of

"raw marijuana and smoked blunts in the passenger compartment was not enough to give

probable cause to search the vehicle, other facts, when viewed in totality of the circumstances,

provided probable cause to search the vehicle."[115]   These additional circumstances include: the

---

[111] *See* Mem. in Supp. p. 6.
[112] *Id.* p. 11.
[113] *Id.*
[114] *Id.*
[115] Op. p. 16.

roadside discovery of a large empty Swisher Sweet cigar box with only a few of the cigars being accounted for; the possibility of other blunts being hidden away in the vehicle; loose marijuana in the truck's console without any packaging; both occupants being a long distance from home without any personal items or luggage for an albeit short visit in Salt Lake City ; and Mr. Villasenor's failure to provide a driver's license and proof of vehicle ownership during the initial stop.

Defendant Villasenor is essentially asking this court to draw another distinction regarding where an officer may search in a vehicle.  During the initial and inventory searches conducted roadside the Trooper searched the passenger compartment and found corroborating evidence. Thus, based on established case law, the officers would have had probable cause to search a trunk if that was applicable to the instant case.[116]  Defendant, however, attempts to draw a line between the probable cause necessary to search the trunk of a vehicle and the probable cause to search the interior of a dashboard.  Based on the facts of this case the court declines to draw such a distinction.

In *Bradford*, the Tenth Circuit stated that once probable cause to search is established, "the officer may search the entire vehicle, including the trunk and all containers therein that might contain contraband."[117]  In *U.S. v. Ross*,[118] the Supreme Court upheld the validity of a warrantless search of a paper bag and leather pouch, holding that where officers have probable

---

[116] *See* fn. 108.
[117] *Bradford*, 423 F.3d at 1160.
[118] 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

cause to search a lawfully stopped vehicle, they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages that might conceal the object of the search.  Finally, in *U.S. v. Loucks*,[119] the Tenth Circuit affirmed the denial of the defendant's motion to suppress agreeing with the district court that once an officer has probable cause to believe drugs are concealed in the car, then the officer may conduct a warrantless search of the car and all containers therein that could conceal the object of the search.[120]

Based on these principles, and the facts of this case,[121] the court finds that the officers had probable cause to search the entire truck including inside the dashboard.  Contrary to Defendants argument, all the items found in the roadside searches were not consistent with personal use.  The swisher sweet box was the largest that the officer had ever found as it could contain 500 cigars.  It was reasonable for the officers in this case to think the missing cigars or blunts may have been stowed away in another part of the vehicle, including in the dashboard.  Moreover, the other circumstances in this case added to the probable cause necessary to search inside the dashboard.  Both occupants were a long distance from home without personal items or suitcases for a short visit in Salt Lake City, loose marijuana was found in the passenger compartment and the occupants were unable to provide proof of vehicle ownership or a driver's license when initially asked.

---

[119] 806 F.2d 208 (10th Cir. 1986).

[120] *See id.* at 209.

[121] Defendant Villasenor offers several cases out of the Ninth Circuit based on their alleged factual similarity.  These cases are not controlling in this court and the court finds them to be inapposite to the facts here because of the discovery of the cigar box.

Further, a review of cases around the country indicates that the dashboard of a vehicle has become a container which is commonly used to conceal contraband.[122]  The Tenth Circuit has concluded that once probable cause has been established "the officer may search the entire vehicle, including the trunk and <u>all containers</u> therein that might contain contraband."[123] Trooper Mortensen had probable cause to search the passenger compartment initially based upon the smell of burnt marijuana. During the roadside searches the Trooper found corroborating evidence which provided additional probable cause to continue searching the vehicle.  Therefore, the court finds no need to create a distinction between the trunk of a vehicle and the dashboard based upon the facts of this case.

Finally, Defendants slippery slope argument that police will become unrestrained in searching vehicles if the court upholds the search in this case is without merit.  There was sufficient corroborating evidence in this case to justify the extended search.  The court is confident, based on past distinctions created by other courts, that future courts can recognize the difference between a single marijuana seed and a pound of marijuana.

Accordingly, based on the facts of this case, the court concludes that the officers had probable cause to search the entire vehicle including the interior of the dashboard.

---

[122] *See e.g.,* <u>*U.S. v. Pineda-Torres*, 94 Fed.Appx. 453</u> (9th Cir. 2004) (discovering 19.4 kilograms of marijuana in the dashboard of a car); <u>*U.S. v. Buckner*, 179 F.3d 834</u> (9th Cir. 1999) (finding 37 pounds of marijuana hidden in the dashboard and rear panels of the car); <u>*U.S. v. Sample*, 136 F.3d 562</u> (8th Cir. 1998) (finding two handguns in a compartment behind the dashboard); <u>*U.S. v. Gastiaburo*, 16 F.3d 582 (4th Cir. 1994)</u> (finding a loaded pistol and cocaine in a hidden dashboard compartment following a search performed five weeks after the car was impounded); <u>*U.S. v. Mendez*, 118 F.3d 1426 (10th Cir. 1997)</u> (finding methamphetamine in an air vent behind the dashboard).
[123] <u>*Bradford*, 423 F.3d at 1160</u> (emphasis added).

## II. STATEMEMENTS MADE BY MR. QUINTERO

At the outset, the court agrees with Defendant Quintero that he has standing to seek the suppression of any statements he made, which may be incriminating, based upon alleged violations of *Miranda* and the Fifth Amendment. The court also agrees that Defendant Quintero may seek to challenge the voluntariness of the statements made by codefendant Villasenor as a means of protecting his own right to a fair trial.[124]

Defendant Quintero argues that his statements must be suppressed because they were involuntary and "adduced in violation of *Miranda* and the Fifth Amendment."[125]  Defendant Quintero further argues that the statements made by codefendant Villasenor were elicited involuntarily and therefore cannot be used against Mr. Quintero.

### A. The Admissibility of Defendant Quintero's Statements

The influential case of *Miranda v. Arizona,*[126] "stands for the well-known proposition that a suspect in custody has a constitutional right under the Fifth Amendment to remain silent."[127]  After giving *Miranda* warnings to a suspect in custody, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."[128]  "If a suspect invokes this right, then the admissibility of any

---

[124] *See* U.S. v. Dowell, 430 F.3d 1100, 1107 (10th Cir. 2005) ("It is clear that [the defendant] does have standing to challenge the voluntariness of a witness's confession."); *see also* U.S. v. Gonzales, 164 F.3d 1285, 1289 (10th Cir. 1999).

[125] Mem. in Supp. p. 22.

[126] 384 U.S. 436, 86 S.Ct. 1602, 16L.Ed.2d 694 (1966).

[127] *See* U.S. v. Alexander, 447 F.3d 1290, 1294 (10th Cir. 2006).

[128] Miranda, 384 U.S. at 473-74.

further statements by the suspect depends 'on whether his right to cut off questioning was scrupulously honored.'"[129]

In limited circumstances police may reinitiate questioning if four conditions are met: "(1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of *Miranda* warnings; and (4) the subject of the second interrogation [is] unrelated to the first."[130]

Based on the facts of this case and for ease of reference the court finds it appropriate to divide the statements at issue into two distinct time periods: (1) statements made prior to the discovery of methamphetamine; and (2) statements made after the discovery of methamphetamine.

**(i) Statements Made by Mr. Quintero Prior to the Discovery of Methamphetamine**

The Government does not contest the fact that both Defendants were given *Miranda* warnings roadside or that Defendant Quintero invoked his right to remain silent.[131]  Trooper Mortensen honored Defendant Quintero's invocation roadside.  After arriving at the jail, however, Trooper Mortensen began to speak with Defendant Quintero after Defendant Villasenor was taken inside the jail by Detective Ekker.  Trooper Mortensen started talking to Defendant Quintero about working out some type of deal to lessen the charges.  Following this

---

[129] *Alexander*, 447 F.3d at 1294 (quoting *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed. 2d 313 (1975)).
[130] *Id.* (alteration in original) (quoting *Mosley*, 423 U.S. at 104-05.).
[131] Op. p. 10.

offer, Mr. Quintero began conversing with the Trooper and stated there was marijuana in the passenger side door of the vehicle.

After speaking with Trooper Mortensen in the patrol car, Mr. Quintero was taken into the booking area and questioned further by Detective Ekker.  Following the initial interview at the jail with Detective Ekker methamphetamine was discovered.  Then a group of officers, which included Detective Ekker, called the "task force" and codefendant Villasenor spoke with Mr. Quintero seeking his help in a controlled delivery of the methamphetamine.

Defendant Quintero argues that Trooper Mortensen violated his *Miranda* rights by reinitiating questioning improperly while they were both sitting in the police car outside the jail. According to Defendant, based upon this violation and the other officers' failure to "scrupulously" honor his invocation of rights, all of Mr. Quintero's statements following this alleged violation should be suppressed.

In contrast, the Government argues that "although Trooper Mortensen may have improperly questioned Quintero in the patrol car, the officers at the jail properly reinstated questioning."[132]  Further, courts have not specifically defined how long of a break is needed in interrogation to constitute a substantial interval, but "there was a substantial break between the arrest at the traffic stop and the interrogation at the jail."[133]  Next, the Government argues that before Detective Ekker began questioning Mr. Quintero, Detective Ekker asked Mr. Quintero

---

[132] Op. p. 11.
[133] *Id.*

whether he had been given his *Miranda* warnings and whether he understood them.  According to the Government this is the "functional equivalent" of a fresh set of *Miranda* warnings. Moreover, the subject of the questioning allegedly changed from whether Mr. Quintero had used marijuana to where the Defendant was traveling and the potential for drug trafficking.  The court finds the Government's arguments unpersuasive.

Defendant Quintero invoked his right to remain silent roadside.  Trooper Mortensen began speaking with Defendant Quintero about a possible deal while they were seated together in the patrol car outside the jail.  There is nothing in the record indicating the Trooper re-advised Defendant Quintero of his rights.  Further, the time in which it took the Trooper to transport the Defendant to jail was not a substantial interval.  Accordingly, the court finds that the Trooper violated Defendant Quintero's right to remain silent when he reinitiated questioning.

In similar fashion, the court finds that Detective Ekker's questioning of Mr. Quintero was not properly reinstated following the *Miranda* violation.  Although one can be given the functional equivalent of their *Miranda* rights,[134] a functional equivalent does not suffice as a fresh set of *Miranda* warnings when a defendant has invoked their rights and refused to talk. The court also disagrees with the Government's position that the subject of questioning had changed.  Trooper Mortensen testified that he was concerned with drug trafficking.  In fact, it appears suspected drug trafficking was the likely reason the Trooper began conversing with Mr. Quintero while they were sitting in the patrol car.  Detective Ekker's questions also revolved

---

[134] *See California v. Prysock*, 453 U.S. 355, 359-60, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981).

around Defendant Quintero's involvement with drug trafficking.   Finally, the court finds there was not a sufficient passage of time between Mr. Quintero's invocation of rights and the interrogation at the jail by Ekker.

Next, the court is not persuaded by the Government's argument that Mr. Quintero voluntarily and knowingly waived his right to remain silent when speaking with Detective Ekker at the police station.  The court agrees that a waiver of a Fifth Amendment right does not need to be express but "can be inferred from the defendant's actions and words."[135]  The totality of the circumstances does not, however, support the Government's position.

Mr. Quintero had invoked his rights and Trooper Mortensen had reinitiated questioning. The Trooper's promise of leniency was coercive in nature.  Thus, Mr. Quintero's waiver was not a "free and deliberate choice."[136]  There is nothing Detective Ekker did to fix this problem and Detective Ekker's questioning was essentially a continuation of those questions posed by the Trooper.  Therefore, any subsequent statements are not the product of a voluntary waiver.

Based on the foregoing, the court concludes that all statements made by Defendant Quintero after he invoked his *Miranda* rights and before the discovery of methamphetamine should be suppressed.

---

[135] *U.S. v. Nelson*, 450 F.3d 1201, 1211 (10th Cir. 2006).
[136] *U.S. v. Curtis*, 344 F.3d 1057, 1066 (10th Cir. 2003).

**(ii) Statements Made by Mr. Quintero After the Discovery of Methamphetamine**

Admittedly, there was some additional time between Detective Ekker's first interview of Mr. Quintero at the jail and the interview of Mr. Quintero following the discovery of the methamphetamine.  During this time, however, Mr. Quintero was in custody.  And, based on what is before the court, not much time passed between the first interview by Detective Ekker and Ekker's return to the jail following the discovery of methamphetamine.  Thus, the court finds that a substantial interval had not passed between the two interviews.  Additionally, there is no evidence showing that a fresh set of *Miranda* warnings were given.  And finally, the subject of the second interview, although addressing different subjects than the first such as help with a controlled buy, was a natural extension of the first interview by Detective Ekker concerning drug trafficking.  Accordingly, the questioning by the task force was not properly reinstated.

Based on the foregoing, the court concludes that the statements made by Defendant Quintero to the task force must be suppressed.  There is also nothing before the court to indicate that questioning was properly reinstated during the attempted controlled delivery.  So, any statements made by Mr. Quintero during the course of the failed delivery should also be suppressed.

In light of the court's decision, the court does not address Defendants arguments concerning the voluntary nature of his statements and the potential violations of the Fifth Amendment.

### (iii) Conclusion

Based on the foregoing, the court finds that Defendant Quintero's *Miranda* rights were violated when Trooper Mortensen began conversing with Defendant Quintero about a possible deal.  The court further finds that the four conditions required for police to reinitiate questioning were not met.[137]   Thus, all statements made by Defendant Quintero following the *Miranda* violation must be suppressed.[138]

### B. The Admissibility of Defendant Villasenor's Statements Which May Incriminate Mr. Quintero

Defendant Quintero challenges the statements made by Defendant Villasenor arguing that they are involuntary.  It is clear that Mr. Quintero may raise such a challenge to protect his rights. [139]  But, a defendant that makes a motion to exclude testimony of a third party on due process grounds bears the burden of proving improper coercion.[140]

The standard for determining whether a statement was voluntary is the same regardless of whether the court is dealing with a defendant or a third party.[141]  A statement is considered to be involuntary "if the government's conduct caused the witness' will to be overborne and his

---

[137] *See Alexander*, 447 F.3d at 1294;  *Mosley*, 423 U.S. at  104.

[138] *Cf. U.S. v. Patane*, 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (plurality) (concluding that the exclusionary rule or fruit of the poisonous tree doctrine does not apply "to mere failures to give *Miranda* warnings"); *U.S. v. Philips*, 468 F.3d 1264, 1265 (10th Cir. 2006) (holding that the physical evidence obtained as fruit of the defendant's voluntary uncoerced statement to a police officer is admissible at trial regardless of whether the officer gave a *Miranda* warning).

[139] *See Dowell*, 430 F.3d at 1107 (10th Cir. 2005) ("It is clear that [the defendant] does have standing to challenge the voluntariness of a witness's confession."); *see also U.S. v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999).

[140] *See id.*

[141] *See id.* (citing *Gonzales*, 164 F.3d at 1289 n. 1.).

capacity for self-determination critically impaired."[142]  In making this determination, courts

consider the totality of the circumstances and the following factors with none being dispositive:

(1) the age, intelligence, and education of the third party; (2) the length of the detention; (3) the

length and nature of the questioning; (4) whether *Miranda* warnings were given; and (5) whether

the third party was subjected to physical punishment.[143]  Finally, "[w]here a promise of leniency

has been made in exchange for a statement, '"an inculpatory statement would be the product of

inducement, and thus not an act of free will."'"[144]

Defendant Quintero challenges the statements made by Mr. Villasenor after the discovery

of the methamphetamine and the statements made by Mr. Villasenor in an interview with

Detective Ekker the day after the failed delivery.  The court therefore divides its analysis into

these two time frames.

### (i) Statements Made by Mr. Villasenor After the Discovery of Methamphetamine

Defendant Quintero outlines the following facts in support of his argument.  After the

methamphetamine was located, Detective Ekker had Mr. Villasenor taken to the commander's

office and confronted Defendant Villasenor asking him if he wanted to be honest now.  Promises

were made to Defendant Villasenor about charges being prosecuted at the State rather than

federal level.  And, Mr. Villasenor was not remirandized.  Thus, according to Defendant

Quintero, Mr. Villasenor's statements were involuntary.

---

[142] *Id.*
[143] *See id.; see also* U.S. v. Glover, 104 F.3d 1570, 1579 (10th Cir. 1997).
[144] Griffin v. Strong, 983 F.2d 1540, 1543 (10th Cir. 1993) (quoting U.S. v. Fountain, 776 F.2d 878, 885 (10th Cir.
1985), and Shotwell Mfg. Co. v. U.S., 371 U.S. 341, 348, 83 S.Ct. 448, 454, 9 L.Ed.2d 357 (1963)).

In contrast, the Government argues that the statements were voluntarily especially because Mr. Villasenor was given his *Miranda* rights and chose to waive them.  In looking at the totality of the circumstances the court agrees with the Government that Mr. Villasenor's statements were voluntary.

In looking at the relevant factors the court notes the following.  Both Defendants were given their *Miranda* rights by Trooper Mortensen.  As outlined *supra*, Defendant Villasenor waived his *Miranda* rights and agreed to speak with Trooper Mortensen.  There is nothing before the court to indicate this waiver was not voluntary and there was no attempt by Defendant Villasenor to invoke those rights prior to the discovery of the methamphetamine or during the interviews that took place before the failed controlled delivery.  Defendant Villasenor's waiver of *Miranda* rights also occurred relatively close in time to the interviews by the task force.

Next, based on the record, the court finds that the statements at issue were not given in exchange for leniency.  The specifics on what Defendants would get for their cooperation was communicated to them by the county attorney after Mr. Villasenor had implicated Mr. Quintero.  Finally, there were no threats of physical harm to Mr. Villasenor and Mr. Villasenor was of sufficient age, intelligence and education to adequately understand he was implicating Mr. Quintero.  Thus, Mr. Villasenor's will was not overborne and his capacity for self-determination was not critically impaired by the government's conduct.[145]

---

[145] *See Dowell*, 430 F.3d at 1107.

Accordingly, Mr. Quintero's motion to suppress Mr. Villasenor's statements after the discovery methamphetamine should be DENIED because the court concludes that Mr. Villasenor's statements were voluntary.

**(ii) Statements Made by Mr. Villasenor to Detective Ekker Following the Failed Controlled Delivery**

In looking at the voluntariness factors following the failed controlled delivery, the court finds that the situation was markedly different than after the discovery of methamphetamine. Mr. Villasenor had observed the use of physical force on his codefendant Quintero following the failed controlled delivery. Mr. Quintero was pushed up against a car and his face shoved into the window allegedly because he failed to cooperate in a manner pleasing to the officers.

Next, the waiver of *Miranda* rights by Mr. Villasenor occurred a day earlier. Detective Ekker started the failed-delivery interview by reminding Mr. Villasenor of his rights and asking whether he understood his rights. In response, Mr. Villasenor said he remembered and understood them. Detective Ekker then asked Mr. Villasenor whether he wanted to "talk about this or not?" Mr. Villasenor responded that there was "nothing to talk about pretty much I just want to know like how long I am going to go to jail." Ekker then intimated that Mr. Quintero wanted Mr. Villasenor to "take the full rap" and that if Mr. Villasenor did not want to "go down alone" he had better implicate Mr. Quintero. Ekker proceeded directly into questions that implicated Mr. Quintero and failed to ever get a voluntary waiver of rights from Mr. Villasenor.

In looking at the relevant factors, the court finds Detective Ekker failed to properly advise Mr. Villasenor of his rights.  Rather than getting a proper waiver, Detective Ekker immediately proceeded to try and coerce statements out of Mr. Villasenor by telling Mr. Villasenor that he would go down alone and take the full rap unless he cooperated.  Such conduct by Detective Ekker resulted in inculpatory statements that were the product of inducement and coercion not free will.  Finally, the court finds that the physical punishment of Defendant Quintero, which Mr. Villasenor observed, provided the possibility that if Mr. Villasenor failed to cooperate, then he too may be punished.

Accordingly, Mr. Quintero's motion to suppress Mr. Villasenor's statements in the interview following the failed controlled delivery should be GRANTED because the court concludes Mr. Villasenor's statements were involuntary.

**(iii) Conclusion**

Based on the foregoing, Mr. Quintero's motion to suppress Defendant Villasenor's statements should be GRANTED in PART and DENIED in PART.

## RECCOMENDATION

As outlined above, it is HEREBY RECOMMENDED that Defendant Villasenor's motion to suppress evidence obtained from the search of the vehicle at the gas station be DENIED.  It is further RECOMMENDED that Defendant Quintero's motion to suppress his statements be GRANTED and Defendant Quintero's motion to suppress statements made by codefendant Villasenor be GRANTED in PART and DENIED in PART.

Copies of this report and recommendation are being mailed to all parties who are hereby notified of their right to object.  The parties must file any objection to the Report and Recommendation within ten days after receiving it.  Failure to object may constitute a waiver of objections upon subsequent review.

DATED this 3rd day of October, 2007.

Brooke C. Wells
United States Magistrate Judge